**Jeffrey Todd PIERCE, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–87–446.**

Court of Criminal Appeals of Oklahoma.

Feb. 5, 1990.

Rehearing Denied March 13, 1990.

David Autry, Asst. Appellate Public Defender, Norman, for appellant.

Robert H. Henry, Atty. Gen., A. Diane Hammons, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

LANE, Vice Presiding Judge:

On October 13, 1986, Jeffrey Todd Pierce was convicted, after a trial by jury, of Rape in the First Degree[1], Oral Sodomy[2], Anal

1. 21 O.S.Supp.1985, § 1111.

2. 21 O.S.1981, § 886.

Sodomy[3], Second Degree Burglary[4] and Assault with a Dangerous Weapon[5] in District Court of Oklahoma County Case No. CRF-86-1135. He was sentenced to thirty-four (34) years on the rape charge, eleven (11) years each for the sodomy counts and four (4) and five (5) years respectively for the burglary and assault counts. The trial court ordered that the sentences be served consecutively. Appellant has properly perfected his appeal from the judgment and sentence of the trial court.

S.B. was living temporarily in a furnished apartment in the Woodlake Apartment complex in north Oklahoma City while she was conducting a market survey in the area for her employer. On May 8, 1985, S.B. left her apartment to go to work. When she got to her car, she noticed a man looking at her, who quickly disappeared into the bushes. The man had blond hair and was wearing a bandanna around his head. He had on a tee-shirt and jeans as well as black leather gloves.

S.B. went to her job site but had to return to her apartment soon after her arrival to get more supplies. As she entered the apartment, she noticed that a window had been broken and that someone had been rummaging through her belongings. As she surveyed the damage, Appellant came out of another room in the apartment and grabbed S.B., threatening her with a knife. The two fought for several minutes before S.B. was overpowered.

Appellant pushed S.B. face down onto the floor. He held a pillow over her face and told her that he would kill her if she looked at him. Appellant demanded that S.B. perform oral sodomy on him and put his penis in her mouth. S.B. saw a meat-fork on the floor near her, which she reached for. Appellant intercepted the fork and stabbed her arm. He then pushed her back down to the floor where he raped and anally sodomized her.

3. *Id.*

4. 21 O.S.1981, § 1435.

5. 21 O.S.1981, § 645.

Before leaving her apartment, Appellant forced S.B. to take a shower. He pushed her into the bathroom while still holding the pillow over her face. While S.B. was in the shower, Appellant left the apartment. S.B. told police that nothing had been taken from her apartment except a bar of soap, a bottle of laundry detergent and the return address from a piece of mail which she had received.

S.B. reported that she believed her attacker was an employee of the apartment complex and that she had seen him outside her apartment earlier that day. At the time of the rape, Appellant was working for a company called Can-do, which performed landscape and maintenance work for the Woodlake Apartment complex. He had been employed with Can-do for about five years.

At trial, Oklahoma City Police Department chemist, Joyce Gilchrist testified that twenty-eight scalp hairs and three pubic hairs recovered from either S.B., her clothing or her apartment, were microscopically consistent with the characteristics found in Appellant's hair. She also testified that there was not enough seminal fluid to determine the blood type of the donor, but Gilchrist was able to determine that the rapist was either a blood type O or a non-secretor. She testified that Appellant was classified as a non-secretor.

As his first allegation of error, Appellant claims that he was unfairly convicted based upon "other crimes" evidence which was improperly revealed to the jury during the testimony of Detective Cook and during the viewing of the composite drawing made by a police artist. The revelations by Cook occurred on cross-examination, during defense counsel's exploration of how another suspect had been ruled out.[6] The testimony in question is found at page 549 through 552 of the transcript:

6. During the investigation, S.B. was shown seventy or eighty photographs of potential suspects. At one point she identified two different men as looking similar to her attacker.

Q. Tell us—read that report and tell us where you state that you went out and got the better photographs and brought them back and she excluded him.

A. After seeing the better photographs, the five by sevens, she still thought it resembled the suspect a lot.

Q. What did you do about it?

A. Well, as it turned out—

WITNESS: I have trouble answering this question, Your Honor.

MR. BURGER: May we approach the bench?

MR. ALBERT: Judge, he's asked the question. I think—

THE COURT: Go ahead. Tell the answer.

WITNESS: He'd already been eliminated by the serologist, Joyce Gilchrist.

Q. (By Mr. Burger) How has she eliminated him?

WITNESS: Same thing, Your Honor.

THE COURT: If you know.

WITNESS: Through hair comparison.

Q. (By Mr. Burger) I believe, Officer Cook, you were in the courtroom. I believe she testified she didn't exclude anybody. I asked her about that name, she said who's that. Would that make a difference in your answer?

MR. ALBERT: Give him an honest answer.

WITNESS: She compared some hairs but they weren't from the B. case.

\*    \*    \*    \*    \*    \*

Q. What other scientific methods do we have that Cannon was excluded? The victim says looks very much like the assailant. Give us some factual reasons why he was excluded.

WITNESS: Your Honor, I'm going to get into some other areas.

THE COURT: Just go ahead. He asked the question, sir. Answer the question.

WITNESS: The hairs of Mr. Cannon were compared by Joyce Gilchrist to the pubic and scalp hairs found on the dead body of Judy Wikert.

Q. (By Mr. Burger) So, good deal. She excludes him, then from the crime of raping S.B.

A. She matched those hairs, B.'s and Wikert's. To exclude one would exclude the other.

Q. She matched the hairs of B. and Wikert.

A. Yes, sir.

MR. ALBERT: Need to be more descriptive, officer.

WITNESS: Sir, we found hairs on the body of a homicide victim. Hairs were found on the body of S.B. Those hairs were compared together and found to be the same. Therefore, whoever committed the crime—

■ Appellant contests the admission of this testimony in three ways: that the procedure used to exclude the suspect was not scientifically recognized, that the comments by the prosecutor, Mr. Albert, lead to the answer given by the witness and finally, that the testimony constituted an evidentiary harpoon. He further contends that the trial court's refusal to allow him to approach the bench at one point added to the problem. We reject all these contentions and find that counsel was given a multitude of opportunities to avoid the detective's ultimate answer, all of which he disregarded. Any error in the admission of the testimony must be deemed invited error. No bench conference was necessary in that the issue had been previously discussed during hearings on Appellant's Motion in Limine which sought to exclude the very information which counsel introduced through his questioning.

The answers to which Appellant now objects resulted purely through the persistence of his own counsel. We have often recognized the well established principal that a defendant may not complain of error which he has invited, and that reversal cannot be predicated upon such error. *Dutton v. State,* 674 P.2d 1134 (Okl.Cr.

**1260**

1984); *Fox v. State*, 524 P.2d 60 (Okl.Cr. 1974). *See also Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

■ In his first sub-proposition, Appellant urges us to consider this issue along with the testimony of Janice Davis, another Oklahoma City Police Department chemist. Appellant claims that Davis' testimony, which was presented to the jury as a part of his defense, clearly establishes that the manner in which the suspect Cannon was excluded from consideration in the present case was not scientifically reasonable. According to Appellant, the evidence tending to prove that the suspect in the S.B. case was the same person that killed Judy Wikert was unreliable, as well as scientifically unsound, and should not have been admitted for any purpose.

Assuming, without deciding, that such was the substance of Davis's testimony, the testimony was introduced by the defense as an attack on the credibility of Gilchrist. Any determination as to the credibility of a witness is solely in the province of the jury. *Hollan v. State*, 676 P.2d 861 (Okl.Cr.1984); *Dodson v. State*, 674 P.2d 57 (Okl.Cr.1984); *Renfro v. State*, 607 P.2d 703 (Okl.Cr.1980). Appellant fully and fairly litigated the question of the procedure used by Gilchrist to exclude the other suspect. We will not interfere with the resolution of any issue by a jury, substituting our judgment for their's, unless we find that the conclusion has no support in the record. *Daniels v. State*, 532 P.2d 1392 (Okl.Cr.1975). We cannot reach that conclusion here. This issue has no impact on our determination that any error involved with the introduction of the evidence was completely invited by Appellant. This evidence was presented to the jury and it was up to them to determine the weight to be afforded the evidence and whether it was scientifically justified.

■ Next, Appellant claims that several comments by the prosecutor lead to Detective Cook's answers in regard to the Wikert murder. While we agree that the comments by Mr. Albert were unnecessary, we do not find that Albert urged Cook to do more than was required by his oath as a witness in regard to telling the truth. Cook sought help from the court several times before he specifically answered the question asked by Appellant's counsel. The information to which Appellant now objects was the direct result of specific questions by his counsel. We do not find that the actions of the prosecutor contributed to the damage caused by defense counsel in any significant manner.

■ Finally, Appellant claims that Cook's testimony was a evidentiary harpoon. Again we must disagree. An evidentiary harpoon is very specifically defined by previous decisions of this Court. In *Bruner v. State*, 612 P.2d 1375, 1378 (Okl.Cr.1980), we held that an evidentiary harpoon is characterized by several factors:

(1) they are generally made by experienced police officers; (2) they are voluntary statements; (3) they are wilfully jabbed rather than inadvertent; (4) they inject information concerning other crimes; (5) they are calculated to prejudice the defendant; and (6) they are prejudicial to the rights of the defendant on trial.

Based on the facts in this case, we must find that the statement by Cook was not voluntary, willful or calculated to prejudice the defendant. On the contrary, Cook very admirably attempted to evade the damaging response which repeated questioning by defense counsel ultimately made impossible. As is the case with the other allegations concerning this issue, we do not find that error requiring reversal was committed.

■ We must also reject Appellant's claim that he was unfairly prejudiced by the caption which appeared underneath the composite drawing of the suspect in this case, prepared and circulated by the police. The caption read:

This suspect is wanted in reference to several sex crimes occurring since May

1985, in the Oklahoma City area. The suspect is a white male, 25 to 30 years of age. He is 5'10" to 6'1". The suspect is a natural blond....

The drawing bearing this statement was introduced by the State as its Exhibit 20. At the introduction of the exhibit, defense counsel specifically stated "no objection." If the appropriate objection had been made at the time the exhibit was admitted, the offending language could have been easily masked. We find that by failing to object at trial, Appellant waived any potential error. *Thomason v. State*, 763 P.2d 1182 (Okl.Cr.1988); *Smith v. State*, 737 P.2d 1206 (Okla.Cr.1987); *cert denied* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987).

As his second proposition of error, Appellant raises a number of issues involving the treatment of the forensic evidence and compliance with his discovery requests. At a hearing on Appellant's pretrial motion for discovery, the State agreed to send all of the forensic evidence to the Serological Research Institute of Emeryville, California (SERI) for independent analysis by experts working on behalf of the defense. (Tr., Motion Hearing, July 23, 1986, p. 4.) The court entered its Order memorializing the agreement. (O.R. 78.) The State's chemist, Joyce Gilchrist, relying on her own personal knowledge that SERI did not do hair comparisons, did not send any of the evidence which pertained to hair comparisons. Unknown to Gilchrist or to the State, SERI had made arrangements to have the hair studied by another lab.[7] Appellant now contends that the State's failure to send the hair comparison materials resulted in a denial of his right to a fair trial in that he was not afforded the opportunity to have an independent evaluation of the evidence.

We find that Gilchrist absolutely violated the terms of a Court Order. Instead of following either the letter of the Order or taking steps to have the Order changed or clarified by the court, she took it upon herself to determine the portions of the Order with which she wished to comply. This was not her decision to make. She was under a direct order from the court to provide *all* of the physical evidence to SERI. The failure to abide by a valid order by a trial court will generally have serious consequences and will always be considered error.

While we cannot take Gilchrist's breach of the law lightly, neither can we find that it was reversible error under the facts of this case. Gilchrist sent the package of evidence to SERI, which received it on August 7, 1986. The package was opened, inventoried and stored. It was assigned to a chemist toward the last of August. The chemist was aware that the hair evidence had not been included with the rest of the evidence. In September, sometime after the 10th or 12th, the SERI chemist, Gary Harmor, told Appellant's counsel that the hair had not been received. Harmor telephoned Gilchrist on September 29 and again on October 3, but did not mention the hair evidence.

Based on the record before us, we must come to the conclusion that Appellant and his agents had knowledge that the hair evidence had not been sent at least two months prior to the October 6th commencement of the trial, yet made no effort to notify the State or otherwise obtain the evidence. While Gilchrist had an absolute duty to send the evidence, Appellant was under an equal obligation to notify either the State or the trial court as soon as he knew that the Order had been violated. We are faced with a situation where both the State and the defense contributed to the ultimate problem; the hair evidence was never subjected to independent review. We must attempt to balance the parties' responsibilities for the dilemma to determine whether reversible error has occurred.

7. The State requested the name of the hair analyst several times, however, Appellant never provided the information.

Appellant urges that based upon *McCarty v. State*, 765 P.2d 1215 (Okl.Cr.1988), his conviction must be reversed and remanded for a new trial. We are not compelled to reach that result in the present case. In *McCarty*, as in the present case, we were forced to compare inactivity and delay by both the State and the defense. In the *McCarty* case, although the defense was very late in naming an independent expert, we found that the greater harm was caused by the State's expert, again Joyce Gilchrist, for not having completed her analysis until the Friday before a Monday trial, despite having had possession of the evidence for almost four years. We held:

> An accused is entitled to pretrial examination of physical evidence and technical reports. *See Stafford v. State*, 595 P.2d 797, 799 (Okla.Crim.App.1979); *Wing v. State*, 490 P.2d 1376, 1382 (Okla.Crim. App.1971); *Layman v. State*, 355 P.2d 444, 445 (Okla.Crim.App.1960). The foregoing would be rendered meaningless unless an accused is afforded a fair and adequate opportunity to make a competent independent pretrial examination. *See Moore v. State*, 740 P.2d 731, 735 (Okla.Crim.App.1987).

*McCarty*, 765 P.2d at 1217.

Unlike the situation in *McCarty*, we find that Appellant could have had a "fair and adequate" opportunity to have conducted his examination of the evidence had he acted on the knowledge that he possessed. There is evidence in the record that the State requested the name of the scientist who was to conduct the hair analysis several times, but that no information was ever provided. Likewise, had Appellant acted quickly to rectify the State's failure to send the evidence, there should have been ample time to have the appropriate tests performed. We are not excusing the State's failure to send the evidence but we cannot condone the manner in which Appellant ignored the problem and made it worse by not raising the issue until the trial. No continuance was requested so that the evidence could be examined, instead, Appel-

lant announced that he was ready to proceed to trial. Had Appellant requested a continuance, he could have been granted additional time to obtain an independent analysis of the hair evidence. Instead, the previous inaction was compounded when Appellant simply proceeded to trial without protest and without having sought the evidence from the State, leading us to the conclusion that he was no longer interested in having an analysis of the evidence done. His inaction must be considered to have been an implied waiver of his right to examination of the hair evidence. *Wolverton v. State*, 707 P.2d 46 (Okl.Cr.1985).

■ Appellant's next argument in regard to the forensic evidence concerns the final reports prepared by Gilchrist. At the hearing on Appellant's request for discovery, the State agreed to provide Appellant's expert witness with the reports which Gilchrist prepared concerning the results of her testing of the evidence. These reports were presented to the expert, however; Appellant now alleges that the reports were of no value to his expert because they did not state Gilchrist's ultimate conclusions which she drew from the results of her tests.

The issue of how much information an expert must put in a report appears to be a question not previously addressed by this Court. In the *McCarty* case, cited to us by Appellant in support of his proposition, we held that the report furnished to the expert in that case was "at best incomplete, and at worst inaccurate and misleading." The error complained of by McCarty, however, was not that the report was not comprehensive enough, but that Gilchrist's report stated that none of the pubic hairs found on the victim were consistent with the hairs of the defendant but then testified to just the opposite at trial. We held that this amounted to a trial by ambush and reversed the conviction. *McCarty*, 765 P.2d at 1218. This result does not answer the question at hand.

There is no dispute in this case concerning the accuracy of the reports. The de-

fense expert, who was not called at trial, testified in support of Appellant's Motion for New Trial that the report included all the conclusions to be drawn with regard to the hair evidence as well as all of Gilchrist's test results with regard to the serological analysis. Instead, Appellant complains that the chemist did not go far enough in her report by setting out the specific conclusions which she would draw based on her analysis of the test results on the body fluids retrieved from the victim.[8]

In this case, all the raw data relied upon by Gilchrist was provided to the defense expert. The evidence was submitted for independent testing. The results from the different testing was capable of being compared with conclusions to be drawn from that. We are not convinced that anything more should be judicially required to be included in the reports.

In *Moore v. State*, 740 P.2d 731, 735–36 (Okl.Cr.1987), we discussed the State's obligation to provide a defendant with copies of technical reports. We relied upon Standard 11–2.1(a) of the *ABA Standards for Criminal Justice* to determine whether reports memorializing the results of scientific testing by the State's expert was discoverable by a defendant in a criminal trial. That Standard provides:

> (a) Upon request of the defense, the prosecuting attorney shall disclose to defense counsel all of the material and information within the prosecutor's possession or control including but not limited to:

> \*　　\*　　\*　　\*　　\*　　\*

> (iv) any reports or statements made by experts in connection with the particular case, including results of physical or

mental examinations and of scientific tests, experiments, or comparisons;....

In *Moore*, we held that the reports were subject to discovery by a defendant. We adopted the ABA guidelines as the standard for disclosure in Oklahoma. We believe that requiring the State to provide reports containing the *results* of any scientific tests performed on the evidence in its possession is sufficient to guard against any violations of a defendant's constitutional guarantees as concerns his "ability to assess the case, and effectively exercise the defendant's right to confrontation." *Moore*, 740 P.2d at 735. Disclosure to the defense of test procedures and results allows the defendant full access to the facts of the case and independent testing will then allow him to determine the veracity of the data relied upon by the State's witness and provide a foundation upon which his expert may formulate his own opinions. An expert's opinion of the conclusions which can be drawn from test results in a particular case in no way alters the actual facts of the case. Accordingly, the ultimate opinion of the expert is not necessary for either the preparation or the presentation of the defense.

In this case, Gilchrist's report set out the results of her testing and in many instances did document her conclusion.[9] We are by no means attempting to discourage such disclosure. Justice is certainly better served when a defendant is provided with the most detailed information possible. The conclusion reached today, however, must be that in the present case, the State was not constitutionally required to provide any more information than was given to the defense. Accordingly, we cannot find that Gilchrist's failure to include in her

---

**8.** Specifically, Appellant claims that it was error for Gilchrist not to set out in the report, her opinion that the attacker was a non-secretor. This opinion was based on her analysis, included in the report, that semen was present in some of the samples (not enough to type for blood group) but only the antigens from the blood group "H", the victims blood type, were found. Accordingly, the donor of the semen was either blood group "H" or a non-secretor.

Based on the amount of antigen found, among other factors, Gilchrist was of the opinion that the rapist was a non-secretor.

**9.** In the report on her analysis of the hairs, Gilchrist noted her conclusions as to each hair whether or not it was consistent with the hair of Appellant.

report all the opinions about which she testified at trial was error requiring either reversal or modification of Appellant's conviction.

██ Appellant next contends that his right to independent testing of the physical evidence was impaired because the evidence provided to his expert had either been used up by the State's testing or had been improperly stored resulting in damage. This issue was not raised either before or during the trial. We have examined Appellant's arguments and find them to be without merit.

Appellant claimed at the hearing on his first Motion for New Trial that the slides prepared by doctors at the emergency room where S.B. was taken after the attack, labeled "rectal smear" and "vaginal smear" were not sent. We rejected a similar argument above in regard to the failure of the State to send the hair evidence based on Appellant's lack of diligence in noticing the State of the failure. We are even less compelled to reach a different result here because even Appellant's expert testified that the slides would have had no value to him because the substances on the slides had been dried and stained. The expert testified that the slides would have been important only if he had not been provided with swabs of the same evidence. Since the other, better evidence was provided, we do not find error.

██ In regard to the complaint that there was insufficient samples provided to SERI of the body fluids taken at the time of S.B.'s examination by hospital personnel, we are unable to place blame with the State. Gilchrist testified in accord with the opinion of Appellant's expert, that there was not enough of the evidence available to adequately perform all the necessary and available tests to determine the donor of the semen found in and on S.B.'s body. This was a disadvantage to both the State and to the defense. It, however, was not a trial error. Likewise, it was not a problem caused or exacerbated by the State.

██ Appellant's third proposition undertakes a detailed analysis of the testimony of Joyce Gilchrist and requests this Court to find that Gilchrist was not a credible witness. During the trial, Gilchrist testified that she was a member of the American Academy of Forensic Sciences. Appellant has provided this Court with several letters which reveal that at the time of trial, Gilchrist had been suspended from the organization for non-payment of dues. While it is true that she was not a current member of the organization, we believe that this fact would not have affected the weight given to her testimony in light of the numerous other organizations to which Gilchrist belonged. It is important to note that the suspension was for non-payment of dues rather than for some breach of profession conduct. If the suspension had been for the later reason, another result may be indicated. In this situation, we find that Gilchrist's testimony, while potentially misleading, was harmless error in light of her other, ample qualifications as an expert. *See Kennedy v. State,* 640 P.2d 971 (Okl.Cr.1982).

██ In the same vein, Appellant also attacks the content of Gilchrist's testimony. Through the use of affidavits from two different experts and testimony presented at the hearing on Appellant's first Motion for New Trial, he attempts to establish that the testimony by Gilchrist at trial was "improper, unfounded and prejudicial." None of the opinions contained in the testimony or the affidavits were presented at trial. There is no contention that either of these experts would have been prevented in any way from appearing on behalf of the defense at the trial. As we have stated before, the jury is the trier of fact and is charged with determining the credibility of the witnesses. We will not allow a defendant a second attempt to test the credibility of the witness on appeal. Impeachment of this nature should have been done through the presentation of witnesses at trial and through cross-examination. This is especially true when the impeachment springs

from evidence or sources readily available during the trial.

At the time of trial, the SERI expert, Gary Harmor, had examined the evidence and completed his report. He was apparently prepared to testify at the trial, but was informed by defense counsel that he would not be needed. For whatever strategic reason, Appellant made a choice not to call the expert until after the trial. We will not allow him to circumvent the effects of his previous decision not to call the expert at trial by considering the evidence on appeal. This is not the proper way to impeach a witness or to present rebuttal testimony. *See Taylor v. State,* 555 P.2d 1073 (Okl.Cr.1976) (inconsistent testimony from other proceedings will not be considered for impeachment purposes on appeal when the inconsistencies were not raised at trial.)

Appellant argues in another proposition that the evidence presented by affidavit from the experts constitutes newly discovered evidence. The law does not support such a conclusion. In *Sheppard v. State,* 731 P.2d 989 (Okl.Cr.1987), we held that evidence would only be considered "newly discovered" if it could not have been discovered before trial in the exercise of due diligence. The evidence in question here is a rebuttal of the testimony by the State's witness at trial. There is nothing new presented other than contrary opinions by experts who should have been and could have been called at trial. As stated above, we will not undertake the type of review requested here.

■ Finally, Appellant claims that Gilchrist improperly bolstered her testimony by implying that the conclusions which may be reached based upon hair comparisons were more exact than science will allow. Ms. Gilchrist testified during the trial, in response to questions from both the State and the defense, that in the years during which she had been involved with hair analysis, she had never seen hair from dif-

ferent people that were microscopically similar in all characteristics. Appellant claims that admission of this testimony was error.

We disagree. At the outset, we must note that Appellant did not object to the questions in this regard by the prosecutor. In fact, Appellant brought the issue up a second time when he chose to explore Gilchrist's answer on cross-examination. Gilchrist testified several times that identification of a suspect could not be based upon hair comparison alone. She testified that although she had never seen two people with microscopically consistent hair characteristics, the possibility could not be ruled out. She testified based upon her own experience, as she was asked, and did not cross into the area of statistical probability which we rejected in *Brown v. State,* 751 P.2d 1078 (Okl.Cr.1988). We do not find her testimony to have been misleading or to have overstated the bounds of science. There is no error here.

■ Appellant's fifth assignment of error concerns his allegation, raised during his first Motion for New Trial, that the jury arrived at his sentence by taking the average of terms of years provided by each member of the jury. At the Motion hearing, Appellant attempted to present the testimony of a newspaper reporter who had entered the jury deliberation room without authorization and found scraps of paper which Appellant claims are proof that the sentence was decided by quotient. He also attempted to produce two of the jurors as witnesses to question them concerning the manner in which their verdict was reached. The trial court refused to hear any of the testimony, ruling that the testimony by the reporter was an improper invasion of the sanctity of the jury. The court properly excused the jurors because they had not been properly brought before the court[10]. We need not address the court's exclusion of the testimony by the reporter because it is irrelevant to a resolution of the question.

---

10. The two jurors were excused when it was determined that they had been improperly served with summons. Both jurors told the court that they did not wish to testify.

We agree with the result reached by the trial court based upon our previous decision in *McKay v. City of Tulsa*, 763 P.2d 703 (Okl.Cr.1988).

In *McKay*, we held that "evidence that the jury utilized the quotient process *at some point* in their deliberations is not fatal to the verdict, so long as the figure finally reached was discussed by the jury and agreed upon as a fair expression of their opinion." When the jurors were polled in the *McKay* case, as in the present case, all the jurors stated that they had concurred in the verdicts. Despite the evidence which Appellant sought to introduce through testimony from the reporter, we do not find that the principal explained in *McKay* have been violated here. Accordingly, we must reject this contention.

■ Appellant next contends that the trial court committed reversible error when it failed to *sua sponte* give an instruction to the jury concerning his alibi defense. At the outset, we note that no such instruction was requested. Any error, therefore, is waived. *James v. State*, 731 P.2d 1384 (Okl.Cr.1987). Failure to give such an instruction will only be considered fundamental error when the testimony establishes that the defendant could not have been at the scene of the crime when it was committed. *Trissell v. State*, 737 P.2d 1228 (Okl. Cr.1987). The record does not support such a conclusion.

■ Appellant sought to prove that he had been on his lunch break with two co-employees at the time S.B. was raped. At trial, none of the witnesses could recall what time they had been to lunch that day or when they returned. Both witnesses testified that they could have been back at the time of the crime. Even Appellant could not remember when the lunch break had occurred on the day in question. He testified only that it was usually between 12:00 and 12:30. We do not find, based on this testimony, that fundamental error has occurred. Appellant failed to establish that if his alibi was believed, that he could

not have been at the apartment complex at the time the rape was committed. Accordingly, any error must be deemed to have been waived.

■ Appellant next claims that the testimony of S.B. was "contradictory, incredible and impeached" requiring corroboration. He further contends that there was no evidence to corroborate the testimony, leaving insufficient evidence to support the convictions. We have reviewed the testimony of S.B. and do not find this to be the case. Appellant's only claim is that S.B.'s identification of her attacker was contradictory, but he fails to point out any instance where S.B. made any inconsistent statements. Instead, he points out differences between S.B.'s story and his own. That is not the proper test when determining whether the testimony of a rape victim requires independent corroboration.

We have repeatedly held that a conviction for rape may be had on the uncorroborated testimony of the prosecutrix, or on slight corroboration, where the testimony of the prosecutrix is not inherently improbable or unworthy of belief.

*Holmes v. State*, 505 P.2d 189 (Okl.Cr. 1973). In any event, there is ample corroboration in the record to support the testimony of S.B. Her story was consistent every time and not at all improbable. There is no error presented here.

As his eighth assignment of error, Appellant claims that if we deem the errors identified above to have been either invited or waived, then we must find that he was subjected to ineffective assistance of counsel. Incongruously, he also states in his brief that:

This proposition is in no way intended as a criticism of trial counsel's general competence. The trial record reveals that counsel strenuously contested the State's case and put forth a vigorous defense.

It appears to us that Appellant concedes that he was not denied his constitutional right to a fair trial.

■ We have long held that allegations of incompetent counsel will be judged by

"whether counsel exercised the skill, judgement and diligence of a reasonably competent defense attorney in light of his overall performance." *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987); *Cotton v. State*, 679 P.2d 1305, 1308 (Okl.Cr.1984). In review of such a claim, we are to accord a strong presumption that counsel was at least constitutionally competent. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We will not make this judgment in hindsight, second guessing counsel's trial strategy. *Dutton v. State*, 674 P.2d 1134 (Okl.Cr. 1984).

■ Counsel's strategy at trial is readily apparent. He sought to establish that the police had not done a good job in the investigation of the case. By his introduction of the other crimes evidence, he sought to prove that other suspects were known, but had been excluded through improper scientific means. He tried to use the fact that the State failed to send the hair evidence to his advantage as well, by claiming it was another instance of sloppy police work. Considering each of the errors set out by Appellant, we cannot say that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In light of Appellant's own admission that he received more than adequate representation at trial, we must reject this proposition.

■ As his final assignment of error, Appellant claims that the trial court abused its discretion in ordering his sentences to run consecutively rather than concurrently. After examination of the record, we cannot find that the trial court abused its discretion in anyway. Accordingly, we do not have the power to modify the sentence. *Money v. State*, 700 P.2d 204, 207 (Okl.Cr. 1985); *Lloyd v. State*, 654 P.2d 645, 647 (Okl.Cr.1982).

Based upon our review of the claims raised by Appellant, we do not find any error which requires us to either reverse or modify the conviction or sentence. Accordingly, Appellant's judgment and sentence are AFFIRMED.

BRETT, LUMPKIN and JOHNSON, JJ., concur.

PARKS, P.J., specially concurs.

PARKS, Presiding Judge, specially concurring:

I am compelled to write separately to address appellant's second assignment of error in greater detail. It is utterly incomprehensible that a professional of Joyce Gilchrist's alleged competence wantonly violated the terms of a district court order. As the majority opinion so accurately proclaims, such deliberate violations will always be considered error. However, I must agree that Ms. Gilchrist's transgressions did not amount to reversible error under the facts of this case. It is apparent from a review of the record that defense counsel's inaction, which indeed must be considered to have been an implied waiver of appellant's right to examination of the hair evidence, outweighed the disregarded responsibilities of Ms. Gilchrist. Therefore, I concur in the result reached by the majority. I wish to stress, however, that such a violation will not escape the type of serious consequences herein eluded under a less compelling set of circumstances.